This video is a derivative work of the Cooperative Extension Office.   Our next case is number 13-1332, Loops, LLC v. Phoenix Trading, Inc. Good morning. May it please the panel and counsel. Brooks Cooper for Appellants Wendy Hemming and Phoenix Trading. I'll refer to them both as Phoenix. I want to start by quoting the discovery order that is at issue here. This is a primarily factually based argument, which I find a little bit odd, but that's where this case has taken us. The toothbrush is primarily at issue in the court's finding that Phoenix did not produce the required documents that underpins one of the three prongs of the Rule 37 finding. Our toothbrushes that fit over the tip of a finger and have no handle, they are called in the catalog no shank, shank being another term for handle. You can find those toothbrushes, pictures of them, in the appendix at AD 125, which is the TBNS, the original one, and TBFLX, the second larger one at AD 133. There are a couple of places. Can I ask you this question? Assuming for a minute that there is reason to doubt the scope of the discovery order and whether the finger-mounted toothbrushes fit within them. Nevertheless, there's a finding that Ms. Hemming gave an at least misleading answer. To some questions at the November 2009 deposition. If that was, I guess why is that not all by itself a sufficient wrong to support the default judgment here against the background of earlier, now uncontested errors or worse, leading to the initial sanction? Certainly, and that's what I would call leg two of the stool holding up the Rules 37 order. Let me address that. This is the price sheet controversy. I understand the trial court's finding. However, we are dealing with a written record here. This is not a matter of interpreting testimony of live witnesses giving way to credibility. You were in the same position the trial court was. In the deposition, this person, who is not a native English speaker, said... It's certainly true that, I gather it is true, the judge was not at the deposition. Nevertheless, the rule about deferring to fact-finding does not apply only to fact-finding based on in-court observation by the fact-finder. Correct. A lot of it is simply somebody's got to be decisive. It's going to be the trier. Certainly, and let me focus on the question of assume that's the only wrong in the case. Why doesn't that support the default damages? Let's assume that's where your hypothetical takes us. Two pieces to the answer there. Recall the procedural posture of the case at the time of the Rule 37 order. Summary judgment had been granted on liability. Defendants were, as a matter of law, not liable to the plaintiff because the plaintiff had not shown any issue of fact relevant to liability under the 286 patent, which at the time of all but a few of the challenge sales had not yet been issued. Then we go to the sanction that is imposed. The most possible draconian sanction is imposed. Defendants who have proven so that there is no genuine issue of material fact that they will prevail on liability are nonetheless assessed functionally all the damages an attorney pays the court. On the basis of a record that did not include what later turned up, namely evidence that there were July 2008 importations of infringing articles. Not the finger ones, but actual flexible handled ones. So it turned out that the summary judgment of non-liability was plainly incorrect. That was not raised. I don't disagree that you may choose to find that on this record. That was not raised by the plaintiff. The basis for the summary judgment was you stopped importing before June 2008 damages, and that was the critical time. It turns out there were importations in July. Yes. Could I try to clarify the exchange that you're having with Judge Toronto? As I understand it, even if we accept the judge's finding that there was false testimony of the deposition, that was not his only ground. Correct. For entering the default judgment, and it's certainly not the only ground for the fee shifting, because he calculated the fee shifting based on the things that he found were wrongful, correct? And he didn't limit it to the costs associated with that deposition. Correct. Correct. If I might finish with Judge Toronto's question and then address that. Okay. Actually, can you follow up on a piece of that? Were any of the fees shifted unrelated to either of the two sanction bases? I did not understand that there's a challenge here to the amount of fees, just the amount. I know there is imposition on the attorney, but the amount of fees is somehow improperly going beyond either the document stuff that led to the adverse inference sanction or to whatever the events were that underlay the... So is there some piece of it that went to the non-Hemming November 2009 deposition and also not to the practices that gave rise to the initial sanction? I'm going to sidestep that a tiny bit by saying this. The appellant, Hemming and Phoenix, made the tactical decision not to challenge the amount of the fees in the trial court. So you do not have a challenge on the record to review. And that is not assigned as error on this appeal. So for the purpose of today, no question about the fees is something that I think I'm here entitled to talk to you about. If you find that you're going to affirm the trial court, I think the number remains the same for the trial court fees because that issue has not been brought before you. It does go to the question Judge Dyke was asking. Maybe the deposition answers might not have been enough to support the default judgment. Correct. The judge talked about other things. Correct. The judge talked about a lot of other things. There were fees in there related to extensive document discovery on the price sheet, the prong two issue. There were fees in there regarding the deposition of the Chinese individual, Mr. Lai. There were a lot of things in there, but those are not challenged. We're not talking simply about $200,000 for a two-page excerpt of a deposition. It's much more than that. But if you accept his order as correct, those fees are not challenged. But your argument is that we can't sustain either the default judgment or the fee shifting based on agreement with the judge about the deposition testimony. I don't think you can because the zone of discretion has a limit. Discretion is not completely unreviewable by this court, or we wouldn't call it discretion. Does it really matter? I mean, if he said, I enter a default judgment because of A, B, and C, and we disagree with him on B and C, but agree with him on A, you would think we'd have to remand to have him reconsider, right? That is one of the possible outcomes of a successful appeal by this appellant. It's not a final decision from you, but a remand for a do-over of at least the sanction question, if not also the question of the default itself. I agree with that. On the deposition itself, the important thing I think to point out is that all parties to the case at the time the deposition were being taken understood the no-shank, the over-the-fingertip toothbrush to clearly not be within the scope of discovery. If you look at AD-242, there is a couple of questions. Yeah, but she's asked... I mean, I don't think that those questions can be interpreted as limited to the flexible-handled toothbrush. Well, let me just turn to AD-242 in Volume 2 very quickly, and actually this is AD-243. She's asked, the short handle is just a hard plastic 4-inch product, yes. Then he goes to a new topic, and this is AD-243, the November 2009 deposition. It's at the very beginning of Volume 2 of the addendum. What page are we talking about here? AD-243. If it helps, at the top it's page 6 of 22 of the trial court attachment, and it's page 31 of the actual deposition, so we've got a lot of page numbers, but it's AD-243. Okay, go ahead. Don't worry. She's then asked, the TBNS, which you described as a no-shank fingertip toothbrush that's also made from hard plastic? Answer, no. That one is like silicone. The P's plastic like baby's plastic. They're kind of soft. A fingertip one, they called a no-shank. There's no handle, nothing. The next question moves on the price list. That's the totality of the plaintiff's choice to interrogate the principal of Phoenix about this toothbrush that they later claim is a central and pivotal piece of evidence, and it simply isn't. She tells them correctly that it has no handle, as Judge Martinez found in his March 2013 order that's at AD-27 at the beginning of Volume 1. But it's the exchange that takes place immediately after that became... Right, and that takes us to the price list issue. Right, so isn't it possible that had the answer there... Let's assume that Judge Martinez could find that that was just a knowingly misleading answer. Maybe the language problem could result in a different interpretation, but this is what we have, and somebody's got to interpret it. Yes. Might it have been the case that if she had given a full, candid answer that the proposal that she was about to make to West Virginia or other prices that she had submitted... I think it's West Virginia that came up with the July 2008... I think it's July 2007, but I know what you're referring to, Judge. The July 2007 price sheet that was reused later... The July 2008 import that suddenly blew up the non-infringement contention, at least the non-infringement contention based on whether there were ever any products after June 2008. Might a candid answer have revealed that? Well, two pieces to that. The imports after the issue of the patent are still properly subject to the summary judgment. I do not agree that it was plain error because the product was not properly marked and Hemming and Phoenix were never given the sufficient notice absent marking to place them on notice of the patent. So there's still a reason why that falls outside it. And then the West Virginia product, I do not believe on this record, is the TB38S, which is the product that reads on the 286 patent because the TBFLX, the no-shank we know was never sold, was offered never sold. The TBNS, the other no-shank, was only sold 2,100 some odd units well before this controversy. What's in the record that can assure us that the TBFlex is a fingertip toothbrush? Certainly. We have Ms. Hemming's testimony in her deposition. We have Ms. Hemming's multiple declarations and her assistant Siegel's declarations at 8062. Does that specifically comment about the TBFlex? They do. 8062, 85, 146, 150 through 151. And more importantly, the photo of the TBFLX is a couple of places, but the direct site is 8133. And you'll see it's a photo of this thing on a finger. The TBNS is at 8125, a few pages before it. It's about the same, but it's a shorter thing. But that's the product designated as TBFLX. There's no question about that, and there's no controversy about that on the record. Is there some kind of technical document or design spec that really connects this phrase TBFlex with a fingertip toothbrush? I understand you show us a picture of a fingertip toothbrush and then tell us that it's the TBFlex. But I think this was the concern the district court had because he apparently lost confidence with this part. Sure. And what we know is the TBFLX, which that's what she calls it, is bought from Image Plastics, who holds the patent. We cite the patent for you in the brief. The patent itself talks about no shank, no handle. She tells you that she applies the TBFLX name to the product she buys from them, and that is in the record. But I agree with you. If we're going to get to that point, it requires accepting that the testimony that she's given is true. We do not have in this record testimony from someone from Image Plastics saying, yes, that's what we sold her. We don't have testimony from the warehouseman saying, that is what I put in the box. But she is the principal of the company, and her assistant, who is not a party to the case, have both testified completely consistently every time that's brought up. That's the factual record on that. And at the damages hearing, the district court says, I can't find that this is a flexible handle. Correct. He basically backs off on what I see as the necessary factual underpinning of what I call prong one of the three prongs supporting his order. But he doesn't take the next step of saying, and therefore, that's not a reason for the sanction. The Mr. Lai issue, I think, is very factually simple. There's nothing in this record to show that Phoenix or Hemming had any idea that Mr. Lai was, pardon me, Lai Ying when he said, I don't have a passport, don't have a visa, can't get it. Was the notice of his deposition one that asked him to, was it a 30B6 notice? And if so, on what companies or what parties' behalf was he supposed to be the corporate representative? It is my recollection that Loops wanted his deposition as a representative of H&L Industries for the purpose of testifying for them. He was asked to come here live. There was the long kerfuffle where trial counsel tried to get him here, represented to the court, that he didn't have a visa, didn't have a passport. He was not a representative of, what is it, Amercare? Correct. Amercare is a DBA of Phoenix. He was never an employee of Phoenix. He was a separate party. He was not a representative of my client and did not speak for my client in any way. I'm into my rebuttal time, so unless the court has more questions. The record doesn't reveal to me how it was later discovered that the July 2008 import actually came in. That was discovered by Appellee Loops through FOIA requests that it sent out all through the litigation to every jurisdiction, and that's proper. It's allowed to do that. That's where I understand Loops to have come up with that. If I have that fact wrong, actually, trial counsel is the co-appellant, and I think he'll correct me if I'm wrong on that fact. Okay. Thank you. Mr. Klingbeil. May it please the court. Rick Klingbeil for myself and Rick Klingbeil, PC. A couple of housekeeping things from Mr. Coopers. All of the imports and sales were disclosed up front in the interrogatories. I believe that's in the record. There was no later discovery. The records were missing of the invoices, but that was fully disclosed early on in discovery, and I believe the record shows that. They knew about all the sales. There were just documents missing showing some of the invoices and prices. Okay. So the answers to the interrogatories way back when referred to a July 2008 importation? As I recall, they do. Did they identify it as the 38 toothbrush? The TB38, yes. Yes. My recollection in the record is all the sales were disclosed up front. There was no mystery about that. It's the search for there being potentially later sales that had all the FOIA requests going and so forth, which of course found none. Is this interrogatory answer in the record? I'll check and believe it is. Is that inconsistent with your summary judgment position that there wasn't any further sales or imports before or after June 2008? No. The summary judgment, and I wanted to clear that up as well. There was a June letter from Loops to Amercare that said, we have a patent. Quit making your toothbrush. The question was whether you were on notice before they filed the complaint. Whether I was on notice? In terms of the liability for the imports, because of the lack of patent marking, as I understand it, there was no liability until a notice was sent, right? And there was a dispute about whether this June letter was a sufficient notice or whether the notice occurred only upon the filing of the complaint. Is that a fair statement? That is a fair statement, yes. I just want to come back to the interrogatories. I'm looking at the interrogatory responses and the answers about importation stop at May 2008, 564, 567, 570. And this doesn't seem to me unimportant. As described to us, the whole litigation as to the patent was about whether imports took place after June 2008 or whatever argument there might have been about when the marking was sufficiently noticed. And you got summary judgment on the ground, your client got summary judgment on the ground that everything stopped before damages could be imposed. I believe there's a part of the interrogatory that talks about sales to New York and there's a further part that talks about imports. My recollection may be wrong on that, but I do know that she got the letter and then stopped selling because the letter went to her. She had some discussion with New York. And there was still a shipment coming over, which was still in her warehouse. There's a lot of product there, as you'll see in the record, sitting in her warehouse, still sitting there unsold when she got the letter. So I believe there's a further part that likely discloses that because my understanding is every single import is disclosed in the record. And I would be shocked if it wasn't. Getting back to the thing on the summary judgment, this was a marking case, of course. The original summary judgment was granted because they did not properly mark the product until November of that year. But then after the judge found sanctions, he decided to say, well, I'm now going to, as a sanction, find the June letter to be sufficient, which I didn't find earlier, which I assume he can do as a sanction. And then that makes the after... Is this the adverse inference? No. This was another part of the sanction he found in his sanction, that he's going to go back and make the June letter now be a sufficient notice letter when it wasn't earlier. So this is how he was able to find that the July 8 import was an infringement of the patent, right? Exactly. And then how the plaintiff then could collect damages on that. Exactly. He essentially changed his mind. And Americare hasn't appealed that infringement judgment to us, right? No. So you're not disputing that that import was in fact an act of infringement? To the extent we're saying that the sanctions are not proper, we're disputing that because the initial finding was that the letter was insufficient under law. And then the sanction caused the letter to now be a sufficient notice. So we're challenging that as part of the overall sanctions as well as the monetary sanctions. So you're challenging the finding of infringement through the sanction, but not the actual infringement finding itself. If the June letter was sufficient, then she imported after that June date, that would have been infringement and damage would have been done, would have been appropriate. And in fact, that's what happened. There was a vote bringing in some product that did come in after June, but the letter was insufficient based on the law. That was his initial finding. And that was the basis of the summary judgment, that it wasn't until November that any of her product would have infringed. So as a result of the default judgment, that original finding of the insufficiency of the June letter was set aside. Exactly. Exactly. Can I ask, suppose, I mean, maybe this is, I'm not sure which of the two of you, this is more appropriately addressed. Suppose we undid the default judgment and sent it back. Is there any doubt, I guess, about the damages, not the sanction, but the damages being either zero if the notice was insufficient or was it $54,000 or something? That's what we're talking about? Yes. Okay. And on the sanction order, which I know you in particular care about, the sanction order doesn't depend, does it, on whether the default judgment was an appropriate remedy as against the named parties? Wasn't it for Rule 37 sanctions for a variety of, you can do Rule 37 sanctions in the course of an ongoing litigation. Yes. I believe they're separate. Yes. I think that's why the judge parsed it out as $200,000 for attorney and AmeriCare and $54,000 for AmeriCare for the damages. But your central argument on your piece of it is that, I take it, that as to applying or imposing the $200,000 or whatever it is sanction on you, on the attorney, there actually isn't a necessary, a sufficient set of findings to justify that unusual result. In particular, not even a specific finding that you acted unreasonably in figuring out whether Mr. Lai had a visa or not. Correct. Correct. There's just no findings of fact and there's no record to support it. This was a case where throughout the discovery, there's just no evidence at all that I or my office countenanced, caused, supported, or had anything to do with my client doing these things, either through negligence or through bad acts. In fact, I think the record's pretty solid that every time there was a question raised by AmeriCare, such as the issue with the Iowa suspicious toothbrushes, I had the client gather up records. We sent things over that were beyond what discovery required to assure them we can move forward without this suspicion going on. There was the 2,600 pages of 12 million other toothbrushes because I wanted them to see the entire universe and sent photos. Just starting with the Lai deposition, I thought you submitted a declaration to the court saying that Lai was unavailable and could not come to the United States. And then one of the first things he said in his deposition was he was available to come to the United States. Absolutely. Absolutely. Throughout that, as he details in his declaration, he did not want to come to the U.S. He had misled me, he had misled Wendy Hemming, he had misled everyone saying, I don't have a visa, I don't have the papers to get here. And as the record shows, I am in contact with the State Department. I was sending him correspondence saying, you need to do something to get here. The judge wants you to be here. Please start on the steps. I called the State Department and found it was about a three-month process because of China and thought that would be too long. So I went to the judge and said, here's our problem. And then what about all the invoices and purchase orders and other papers and documents that Hemming was referring to in her deposition that I guess it was promised that those would ultimately be delivered to the other side and they just never got there? And I can only say I strove diligently to get those and they were not forthcoming. It sometimes happens with clients that you just, you can go to their office, you can go through boxes with them, you can look around, you can untangle the spiderwebs in rats' nests, but the documents aren't there. As an attorney, there's just nothing practically you can do to make it happen. What about a litigation hold? Apparently there was somebody deposed saying that she was deleting emails or destroying documents even after the discovery order. I did, as I always do, sent over the initial discovery request from a client, had a conference, explained to them the importance of this, and told them, whatever you have, keep it like it is. This is a small, tangled little office that's messy. They had one little PC and I believe she was getting rid of some emails. I'm not sure they were connected with the discovery issues in this case, but she was getting rid of emails, I found out later, to make more room on her hard drive, which is unfortunate. I didn't sanction it. I would never sanction that. I told them, preserve what you got. If we need to, we can come there and bring in another disk. Oh no, we'll be fine with that. This is not a thing where I'm trying to get the client to be sneaky. The facts won this case for me, and they would win this case for me again, because this factual record of all the documents in this case would support a summary judgment. If it was a complete and full record, it would still support a summary judgment. Simply put, I will stand here and tell you, and I think the evidence shows, on the price sheets, there was never a price sheet for the TB38S. It was never a toothbrush made for her general sales. It was made just to target this New York contract, which would have made her a few million dollars. She made it. She didn't put it on a price sheet. She sold it only to New York. So there was no price sheet with anything that she considered to be a flexible-handled toothbrush. I think we're out of time here, Mr. Klingbeil. We'll give one of you two minutes or a bottle, and you can figure out which one of you. Thank you, Judge. Thank you. Good morning, Your Honors. I am Stephen Hogan, and I represent the Appellee's Loops LLC and Loops Flexbrush LLC. I find the district court's orders here to be somewhat confusing. There's a reference in a number of places to declarations that may have been false, and I assume that you agree that the fact that something may have been false isn't a ground for entering sanctions, right? Something that may have been false can be a grounds for entering sanctions. It can be a grounds for entering sanctions? How so? If there is, in addition to that, evidence demonstrating that the same witnesses did provide false testimony. I don't understand that. You can be sanctioned for false testimony, but I don't understand how you can sanction somebody for testimony that may have been false. As I understood the reference to other declarations that may have been false, the trial court was properly troubled with the entry of partial summary judgment based on… But my question is, can a district court sanction somebody for submitting a declaration that may have been false? In isolation, I would say no. Okay. So what exactly here is the basis for the default judgment and for the monetary sanctions? What do you understand him to have said? One, I suppose, is the Hemings or Hennings, whatever it is, deposition testimony, right? Yes, Your Honor. And one is the representations made about the unavailability of lay, right? Correct. What, in addition to those two things, do you rely on? The most critical thing that comes immediately to mind is the testimony of Ms. Hemings' assistant, irrefuted, I believe, in this record, that she was deleting e-mails up until, I think, days before her deposition. Is that the basis for the adverse inference sanction? That was part of the – let's see. That deposition, as I recall, was taken after the adverse inference sanction had already been imposed. The problem with it is not only has she been deleting e-mails, but she testified that there had been no litigation hold. Where do I find that in the district court's order here? I read that into the district court's discussion of declarations that may have been – So he doesn't say that he's relying on that or making that finding? I don't recall him including it in the order. I reviewed the order in detail. Okay, but I think we have to deal with the order the way it is. What I'm asking you is what is it in the order that was the basis for the default judgment and for the monetary sanctions? We've identified two things, Hemings' deposition and the circumstances surrounding the lay deposition. What else? There is also the course of conduct that led to the prior two discovery orders. The failure to disclose information which the plaintiff only discovered because of the Freedom of Information Act request. Critical among them being the West Virginia bids and the timing of those bids relative to – I think it was a day or two after Ms. Heming and her assistant testified at deposition saying we have no price sheets, we have no price lists. Well, that's the Hemings' deposition finding that she gave false testimony at the deposition. Yes, but there's also the evidence that was discovered in the Freedom of Information. Where does he say – where does he rely on that in the order? In the order? Yeah. I understood him to be relying on that in determining that Hemings' deposition – He recites it at the beginning of the order, says that the plaintiff has discovered this information after the close of discovery through Freedom of Information Act. And then – Where does he say I'm basing my sanction on the failure to produce the stuff that was discovered by the FOIA request? He does not expressly say that. This is the final order in a series. The court took a measured series of steps. First, he ordered that they disclose all information regarding the flexible handle tool brushes. They didn't do that. Then he entered another order. Well, what did they not produce? Well, we now know that they did not produce the price sheet. But also, never in this case did they produce documents that we would expect to exist, technical specifications, communications with manufacturers in China, whether it be email or contracts, etc. With respect to what product? Pardon me? With respect to what product? With respect to the – any – the infringing product. Well, what's the infringing product? The infringing product is a flexible handle tool. No, no, no. Are we talking about the TBFLX? What are we talking about? Well, one of the problems with the case was that the loops did not have control over what Amercare was calling this product. And it named it various things, as far as we could tell. One was TB38-S. The problem is this. He seems to say in his order he didn't produce documents about the TBFLX. And then he goes on to find that it hasn't been shown to me that the TBFLX is a flexible handle toothbrush. Well, he goes – he does say that. He says, I can't tell either way because I think he's rejected the – or is not willing to accept the testimony of Ms. Hemming, who is the only one who tells us that this picture that we're showing – What is your evidence that the TBFLX is a flexible handle toothbrush? Two things. One is that it does show up on the price sheets at a price point which matches the price point for the flexible handle. The testimony was that it's $0.04 to $0.15 for a regular toothbrush. These flexible handle toothbrush costs on an order of magnitude greater, the testimony would have put that price at around $0.80. The TBFLX shows up as the only thing at $0.75. The trial court correctly, I think, noted that the argument here is the TBFLX isn't a flexible handle toothbrush because you can put your finger inside the handle. It's just like the other one, which was a fingertip toothbrush that had no handle. They're trying to make it sound like a handle-less toothbrush. The trial court was very clear in its previous orders that if there is a flexible handle on a toothbrush, you need to produce it. What we have here is the defense was the trial court, I think correctly in the order noted, that even if you accept the testimony that this TBFLX is, the picture that we have is the TBFLX. We don't know that for sure, but if you accept that, it had a flexible handle coming off of the bristles. Therefore, for the defense to unilaterally decide not to disclose that or information regarding that was in violation of the prior order. Was Emercare awarded the West Virginia contract? I don't believe so. I'm not sure whether that's in the record or not. They made a pitch to sell, among other things, the TBFLX to West Virginia. We don't know in the record whether there was ever a shipment made of the so-called TBFLX to the United States for West Virginia. As I recall, if there was, we were not able to discover it. I don't believe there was a sale made in West Virginia because that would have been part of the damages presentation, and the trial court would have included that if we'd have been able to prove a sale to West Virginia. What we don't have, and I think what troubled the trial court the most about this, is if it weren't for the Freedom of Information Act, we wouldn't have found out about West Virginia. There was no sale ultimately there. But where else out there were there sales that actually occurred or contracts that led to the importation of these things? Maybe the sale didn't go through, but we'd still be entitled to the royalties. In the July 2008 import, where did that get? Where was that supposed to be sent to? From the plaintiff's side of the case, we weren't satisfied that we ever really knew. I think Amercare took the position that it was part – I don't recall what their position was. I heard today that it was a shipment that was in transit, but I don't think they ever said where it was going to go. And that's the problem. It's like Mr. Klingbeil and his client are sitting behind a table. They've got 20 cups turned upside down. And we have to guess whether it's TBFLX or TB38S and whether that's got the P under it. And they're looking at us saying, we're doing full, fair, honest disclosure. It shouldn't be a game. Are you contending that it was unreasonable for them to conclude that the TBFLX, assuming that it is what was shown at the hearing, was not a flexible-handle toothbrush? Yes, Your Honor. And I believe the trial court – Why was it unreasonable for them to conclude that it wasn't within the document request? Because it is – they're in here today trying to make it sound like a fingertip toothbrush. Well, it is a fingertip toothbrush, right? Well, the one – the trial court made this distinction, and I think it was a good one to make. It goes down to the middle knuckle. Yeah, the fingertip actually goes on the fingertip. The TBFLX goes down to the second knuckle. And it is made out of a flexible material. And so it's not – I'm looking at the patent. This is about patent infringement. The patent claims demand a whole lot more than the simple term flexible-handle, about which maybe one could argue, is this piece of it a handle or not a handle? Is there any conceivable way that the claim requirements here, which – I have a full column, and they talk about all kinds of things that, as I read it, could not possibly apply to the down to the middle knuckle TBFLX. Why doesn't that make the reading of the discovery order in a case about this patent quite reasonable? Two reasons. One is I agree with you that if this thing that they have identified, without providing the technical specifications or anything other than testimony by a discredited witness, if it is the TBFLX is the longer flexible handle that goes down to the knuckle, it's not an infringing product. But that doesn't – the trial court said, you disclose all of the documents regarding flexible-handle toothbrushes. If they had done that, we could have gone into that. We could have tested it, and we could find out whether or not this TBFLX is or is not the one that they showed up with, the one that wraps over the finger is the TBFLX. Maybe it is, maybe it isn't. That's the problem. The problem is its discovery. It leads to the discovery of admissible evidence. We were searching for admissible evidence of the sale or importation of infringing toothbrushes. And if this, in fact, isn't one, we've resolved it. But if it is, or if it leads us to the discovery of other importation or sale of infringing products, the point is we were denied that. And we were denied that because they chose not to follow the order that the trial court made, which is disclose if it has a flexible handle. And this clearly had a flexible handle. Can I just ask you quickly about the imposition of fees on counsel? I don't remember seeing, even as to the circumstances surrounding Mr. Lai and his deposition, a finding by the district judge that counsel acted unreasonably in coming to the conclusion, presumably because Mr. Lai told him, that Mr. Lai didn't have a visa. And he represented that. And I also don't recall the district judge making any other findings about the unreasonableness or worse, bad faith, willfulness, whatever, of counsel. Am I neglecting to remember something? The trial court did not specifically include counsel in the recitation of the factual background, the misdeeds that led to the sanctions. I agree with you. I mean, aren't those findings critical for what is, after all, a pretty unusual and pretty harmful subject of the sanctions imposition on an attorney, even under the Rule 37 standard about whether it's unjust or not, without findings about it? Well, Mr. Klingbeil has asked for de novo review because he says there are no such findings. As I understand the case law, there's no express findings. There's clearly implied findings that Mr. Klingbeil was participating in this. He did not, there's undisputed testimony. He clearly participated. I mean, he came into court and he said, Mr. Lai doesn't have a visa. I've talked to the State Department. It'll take three months. Can't get in here. Now, if there was something wrong with that, it was that Mr. Lai did have a visa, and so if there was something unreasonable about what counsel said, it would simply, it had to be something unreasonable about the simple factual premise that underlay the whole thing, which is, did he have a visa or not? I mean, I think you suggest he should have demanded an affidavit or something? Well, the question is, this all comes in later. He comes in later with an affidavit by Mr. Lai saying, I was not truthful to him. The trial court did not have to accept that. The trial court lived through this. But the trial court didn't disbelieve it, that he was told that, that Mr. Klingbeil was told that by Mr. Lai. Well, that's correct. I guess I'm not getting. How could a sanction be appropriate if Mr. Lai, in fact, told Mr. Klingbeil that he didn't have a visa, and Mr. Klingbeil transmitted that to the court? How could that be sanctionable? I don't believe it should be. But I think the trial court determined that based on this pattern of practice of not putting a litigation hold in, of witnesses sitting at depositions saying we have these documents, and they were never produced. Where is the finding that there was no litigation hold? There is no finding in the order saying Mr. Klingbeil should have imposed a litigation hold. But there is unrefuted evidence. You keep rewriting the order to say things that it doesn't say. That's the problem. And I guess I apologize because my understanding is that it's not a de novo review. But if the trial court has not made a specific finding that this court believes needs to be made, if the record supports that finding, then in reviewing for abuse of discretion, this court can uphold the trial court's ruling. In other words, it's not de novo review. If there's no specific finding but the record supports it, then there's no showing of an abuse of discretion. That's why I go beyond the order, Your Honor. And I know I've gone over my time. Anything further? Okay. Thank you, Mr. Hogan. Thank you. Mr. Cooper. Thank you, judges. I'll present joint rebuttal for all appellants. I want to lead off with Joint Appendix 687, Declaration of Julie Siegel, paragraph 10, line 7. Plaintiffs claim that I was never instructed to preserve information from the AmerCare computer system after the filing of this lawsuit. While it's technically correct I was never specifically instructed to not delete any information from the computer system, early on in this case I was instructed to obtain, copy, turn over to AmerCare's attorney, and preserve the originals of all documents in any way related to or concerning the TB, excuse me, 38S toothbrush. It was obvious to me from that instruction that I was not supposed to delete that type of information from the computer, and I have not done so. Again, as stated above, between the time I learned of this lawsuit and search form produced documents, I did not delete any e-mails from the system, any e-mails. That's the evidence in the record on Siegel and litigation hold, et cetera. Next. I'm sorry. Siegel was whom? Siegel is the one employee of Phoenix Trading, the office worker, the one who controlled the computer. Addendum 85, another declaration of Siegel from earlier in the case. I cannot recall AmerCare making any sales of the TBFLX to any customer and believe this toothbrush was never sold to any customer. This leads to West Virginia. The West Virginia bid included a document that contained the TBFLX on the price sheet. That bid was not a bid to sell the TBFLX but was to sell other things, and it was an unsuccessful bid. The July 2008 shipment of documents was pursuant to an existing contract with New York that predated issuance of the patent. Those toothbrushes are the TB38S. They are the ones accused to infringe. We don't argue they don't. Those toothbrushes today sit in AmerCare's warehouse because we told New York, because of the risk that loops would claim as it's claiming that they were infringing, we would not ship them, and New York said we're not going to hold you to that contract or argue that you violated it. We're not going to pay for them either, but that's fine. That's the totality of facts on that record. There was never an importation of TB38S for sale to any customer other than New York, nor was there an importation of that toothbrush after July 2008. The TBFLX is simply a toothbrush that fits over the finger, and it is, the only word that comes to mind, is sophistry, to say that the portion that fits over the finger should be known to be a handle to the point that everyone should read the judge's discovery order to know the TBFLX must have documents produced, and that's a reason to deny summary judgment that has been granted, grant all default judgment sanctions, grant attorney fee sanctions, and even sanction counsel. That is an abuse of discretion. If it fits over the finger, it's not a handle. What do we call the thing we put on our hands in the winter when it's cold? It's a glove. Does the glove have handles? No, it has fingers. It goes over the hand. What do we hold in our hand to paint our house? It's a paintbrush. It has a handle because it goes in our hand. That toothbrush does not have a handle. A couple more points. What we have here is plaintiff's unwillingness to accept that the totality of the potentially infringing sales of the toothbrush that reads on the 286 patent were to New York and New York only, and the last import was July of 08. The plaintiff, as you'll see from this record, did not cease and may have continued to today, for all I know, sending FOIA request after request because he will never accept the truth. The problem is this trial court's judgment, this discovery sanction order, is not based on knowing falsehoods. It's based on, at best, a reasonable but negligent misreading of the discovery order. I don't think the TBFLX falls in it at all, but if it does, this is a reasonable misunderstanding. And Ms. Hemmings saying in the pivotal deposition section about the price sheet, she did not say our price sheet does not change. She said our price hasn't changed for years. That's AD 242. I think, Mr. Cooper, we're about out of time. Thank you, Judge. Thank you.